## UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | | |
|---|---|---|
| SHIRLEY FAWCETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No. 2:24-cv-00235-NT |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

### ORDER ON MOTION TO DISMISS

Before me is the Defendant's motion to dismiss the Plaintiff's amended complaint (ECF No. 12). For the reasons stated below, the motion is **GRANTED IN PART** and **DENIED IN PART**.

### BACKGROUND

On May 3, 2023, Shirley Fawcett had an appointment with the Social Security Administration ("**SSA**"). 1st Am. Compl. ("**Am. Compl.**") ¶¶ 32, 34 (ECF No. 7). The SSA "serves all Americans," but "a large percentage" of its office visitors are "elderly, disabled, or both." Am. Compl. ¶ 22. The purpose of Ms. Fawcett's appointment was to obtain a new Social Security card, which she needed to move into a new independent living facility. Am. Compl. ¶ 32. The appointment, which had to be in-person, was at the SSA's office in the Custom House in downtown Portland, Maine. Am. Compl. ¶¶ 5, 35–36. The SSA had just moved into the Custom House days before. Am. Compl. ¶ 35. Ms. Fawcett's daughter called ahead of the visit, and an SSA agent told her the office was located inside the Custom House on Commercial Street. Sworn

Aff. of Victoria Thayer ("**Thayer Aff.**") ¶¶ 5–6 (ECF No. 34-4). The SSA agent did not tell her about any other entrances to the Custom House. Thayer Aff. ¶ 7.

Ms. Fawcett's daughter drove her to her appointment and dropped her off at the Custom House's back entrance on Commercial Street. Am. Compl. ¶¶ 38–39; Thayer Aff. ¶ 8. There were no signs at the Commercial Street entrance informing visitors that additional and accessible entrances were available. Thayer Aff. ¶ 9. Ms. Fawcett's daughter would have liked to help her mother into and out of the building, but there was no available parking nearby. Am. Compl. ¶ 39; Thayer Aff. ¶ 8. So, Ms. Fawcett's daughter circled the area and (unsuccessfully) looked for a parking spot. Am. Compl. ¶¶ 39, 45.

After Ms. Fawcett's SSA appointment, she exited the Custom House through the back entrance on Commercial Street. Am. Compl. ¶ 42. That entrance has multiple steps between the entrance doors and the sidewalk. Decl. of Waldemar Rogowicz ("**Rogowicz Decl.**") ¶ 5 (ECF No. 32); Am. Compl. ¶ 19. The entrance had no handrails. Am. Compl. ¶ 19. Ms. Fawcett could walk independently but was elderly and relied on handrails on staircases. Am. Compl. ¶ 37. Though she proceeded as carefully as possible, it had rained that day, and the steps were slippery. Am. Compl. ¶¶ 41, 46–47. Without a handrail to help her balance, Ms. Fawcett fell down the stairs and onto the pavement below. Am. Compl. ¶¶ 46–48. She sustained significant injuries from the fall. Am. Compl. ¶ 49.

The Custom House, a historically significant building listed in the National Register of Historic Places, is maintained and managed by the General Services

Administration ("**GSA**"), a federal agency that provides workspaces for federal employees and operates federal buildings. Am. Compl. ¶¶ 4–5; Def.'s Mot. Exs. 10, 11 (ECF Nos. 12-10, 12-11). The GSA completed major projects on the Custom House in 1998, 2009, and 2013. Rogowicz Decl. ¶¶ 6–9. At some point, the GSA installed a handrail on the steps of the Custom House's front entrance on Fore Street. Am. Compl. ¶ 15.[1] In 2009, the GSA's work included alterations to the Commercial Street entrance's exterior door. Rogowicz Decl. ¶ 8. But the steps at the Commercial Street entrance "are original to the building and have not been altered or renovated." Rogowicz Decl. ¶ 6. In 2013, the GSA added a handicap-accessible walkway and entrance with an automatic door on the Custom House Street side of the building, among other accessibility upgrades. Rogowicz Decl. ¶¶ 9–10. The GSA completed this 2013 project "to provide an accessible route to meet [Architectural Barriers Act] compliance." Rogowicz Decl. ¶ 10.

In July of 2024, Ms. Fawcett filed a one-count complaint against the United States[2] alleging that the GSA's negligence caused her fall and resulting injuries. Compl. (ECF No. 1). The United States filed a motion to dismiss for lack of jurisdiction and Ms. Fawcett responded by amending her complaint. Mot. to Dismiss (ECF No. 6); Am. Compl. Her amended complaint added allegations of negligence against the SSA,

---

[1]     Ms. Fawcett alleged that the Fore Street handrail was added in 1998, 1st Am. Compl. ("**Am. Compl.**") ¶¶ 6–8, 14–15 (ECF No. 7), but jurisdictional discovery has cast doubt on that allegation, *see* United States' Suppl. Briefing 4–5 (ECF No. 33). In any event, the timing of the installation of the railing at the Fore Street entrance is not relevant to the analysis that follows.

[2]     I use the terms "Defendant," "United States," and "Government" interchangeably in this order.

among other changes.[3] *See* Am. Compl. ¶¶ 22–31. The United States once again filed a motion to dismiss, and I held oral argument on the motion. Mot. to Dismiss Am. Compl. Pursuant to Fed. R. Civ. P. 12(b)(1) ("**Def.'s Mot.**") (ECF No. 12); Minute Entry (ECF No. 27). During oral argument it became clear that there were open— and, according to the parties, easily answerable—questions about key facts that bore on my jurisdiction over this dispute. Accordingly, I deferred ruling on the motion to dismiss and ordered the parties to propose a plan for limited jurisdictional discovery and supplemental briefing, which they did, and which I approved. Minute Entry; Order on Jurisdictional Discovery (ECF No. 29). With the benefit of additional discovery and briefing, the matter is now before me on the United States' motion to dismiss the amended complaint for lack of jurisdiction.[4]

## LEGAL STANDARD

On a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), I accept as true all well-pleaded facts in the plaintiff's complaint, evaluate them in the light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor. *Fothergill v. United States*, 566 F.3d

---

[3]    The Plaintiff's amended complaint named the Social Security Administration ("**SSA**") as the defendant. *See* Am. Compl. 1. At oral argument, Plaintiff's counsel explained that this was a typographical error and that the United States is the proper defendant. I have modified the caption accordingly and recognize the United States as the only defendant. *See* Fed. R. Civ. P. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party.").

[4]    Ms. Fawcett requested another oral argument in her supplemental brief. Pl.'s Suppl. Briefing on Def.'s Mot. to Dismiss ("**Pl.'s Suppl. Br.**") 13 (ECF No. 34). Based on my analysis of the parties' supplemental filings and given that I have already held oral argument on the Government's motion to dismiss, I do not view a second oral argument as helpful here. Accordingly, I **DENY** Ms. Fawcett's request for oral argument.

248, 251 (1st Cir. 2009). I may consider evidence submitted by the parties without converting a Rule 12(b)(1) motion to dismiss into a Rule 56 motion for summary judgment. *Gonzales v. United States*, 284 F.3d 281, 288 (1st Cir. 2002). "As the party asserting federal jurisdiction, [the] [P]laintiff[ ] bear[s] the burden of establishing its existence." *Reyes-Colón v. United States*, 974 F.3d 56, 60 (1st Cir. 2020).

## DISCUSSION

## I.   The Federal Tort Claims Act and the Discretionary Function Exception

"As a sovereign, the United States is immune from suit unless it consents to being sued." *Reyes-Colón*, 974 F.3d at 58. Congress has the authority to grant that consent and remove sovereign immunity. *Merlonghi v. United States*, 620 F.3d 50, 54 (1st Cir. 2010). With the Federal Tort Claims Act ("**FTCA**"), Congress did just that. The FTCA authorizes civil actions for damages against the United States for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment . . . ." 28 U.S.C. § 1346(b)(1). But this seemingly broad grant of authority is limited by several exceptions. And if an exception applies, "the government's immunity remains intact," and the court lacks subject matter jurisdiction over the claim. *Reyes-Colón*, 974 F.3d at 58.

The exception at issue here is the discretionary function exception. It preserves sovereign immunity for tort claims based on "the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be

abused." 28 U.S.C. § 2680(a). This exception "preserves the separation of powers by preventing judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Reyes-Colón*, 974 F.3d at 58 (citation and quotations omitted). To determine whether the discretionary function exception applies, courts "first must identify the conduct that is alleged to have caused the harm[.]" *Fothergill*, 566 F.3d at 252. From there, courts "determine whether that conduct can fairly be described as discretionary, and if so, decide whether the exercise or non-exercise of the granted discretion is actually or potentially influenced by policy considerations." *Id.*

Accordingly, I start by identifying the conduct that allegedly caused the harm. To identify such conduct, the First Circuit has instructed that it is not a plaintiff's characterization that matters but rather the "nature and quality" of the conduct itself. *Id.* at 253. First Circuit examples make clear that this characterization should be a succinct statement of the allegedly negligent conduct at the heart of the case. *See, e.g.*, *Reyes-Colón*, 974 F.3d at 60; *Fothergill*, 566 F.3d at 253; *Shansky v. United States*, 164 F.3d 688, 690–91 (1st Cir. 1999). Here, the alleged harm-producing conduct was the Defendant's failure to: (1) make the back entrance of the Custom House safe and accessible to visitors; and (2) direct SSA visitors to one of the safer or accessible entrances to the Custom House.[5]

---

[5]     In her amended complaint and response to the Government's motion to dismiss, Ms. Fawcett also faulted the Government for choosing to locate a public-serving SSA office in a building without a safe and accessible entrance. Am. Compl. ¶ 52(e); Pl.'s Resp. in Opp'n to Def.'s Mot. to Dismiss 14–15 ("**Pl.'s Resp.**") (ECF No. 18). However, following jurisdictional discovery, it is now clear that Custom House *did* have an accessible entrance when the SSA moved there in 2023. Decl. of Waldemar

The next step of the discretionary function analysis is to evaluate whether each instance of harm-producing conduct was discretionary. "[C]onduct is generally considered discretionary unless a federal statute, regulation, or policy specifically tells federal officials to act a particular way." *Reyes-Colón*, 974 F.3d at 60. Then, "[t]he second question (asked only if the conduct involves an element of discretion) is whether the exercise or non-exercise of the granted discretion is actually or potentially affected by legitimate policy-related judgments[.]" *Id.* at 59 (citations and quotations omitted). Accordingly, I apply these inquiries to each instance of alleged harm-producing conduct.

### A.    The GSA's Failure to Make the Custom House's Commercial Street Entrance Accessible to Visitors

#### 1.    Was the Conduct Discretionary?

Ms. Fawcett points to multiple authorities that she maintains required the GSA to make the back, Commercial Street entrance of the Custom House accessible to visitors.

#### a.    The Architectural Barriers Act

First, Ms. Fawcett points to the Architectural Barriers Act ("**ABA**"). Pl.'s Resp. in Opp'n to Def.'s Mot. to Dismiss ("**Pl.'s Resp.**") 7–8 (ECF No. 18). Through this statute, Congress directed the GSA to "prescribe standards for the design, construction, and alteration of buildings . . . to insure whenever possible that physically handicapped persons will have ready access to, and use of, such buildings."

---

Rogowicz ("**Rogowicz Decl.**") ¶¶ 9–10 (ECF No. 32). Thus, I no longer need to address this alleged harm-producing conduct.

42 U.S.C. § 4152.[6] The GSA complied with this directive, first with the Uniform Federal Accessibility Standards ("**UFAS**"), and then with the Architectural Barriers Act Accessibility Standards ("**ABAAS**"). Whether the UFAS or the ABAAS apply to a particular project is a matter of timing. The UFAS apply if the "construction or alteration" began on or before May 8, 2006, and the ABAAS apply if it began after May 8, 2006. 41 C.F.R. § 102-76.65(a)(1). Under the ABA, "[e]very building . . . altered after the effective date of a standard issued under this chapter . . . shall be . . . altered in accordance with such standard." 42 U.S.C. § 4155.

Following jurisdictional discovery, the parties now agree that the only alteration to the exterior Commercial Street entrance involved changes to the door during the 2009 renovations.[7] United States' Suppl. Briefing 3–4, 5 (ECF No. 33); Pl.'s Suppl. Briefing on Def.'s Mot. to Dismiss ("**Pl.'s Suppl. Br.**") 6–8 (ECF No. 34).

---

[6]     In this statute, "building" means "any building or facility" that is "to be constructed or altered by or on behalf of the United States" and whose intended use requires it to "be accessible to the public." 42 U.S.C. § 4151(1).

[7]     In her amended complaint, Ms. Fawcett alleges that both the Fore and Commercial Street entrances were renovated in 1998. Am. Compl. ¶¶ 6–8. And with her briefing on the motion to dismiss, she provided information from the GSA's website, which referenced the 1998 renovation. Pl.'s Resp. Ex. 4 ("**GSA Fact Sheet**") (ECF No. 18-4). The GSA Fact Sheet reported that "[i]n 1998, the aluminum doors, which were installed during the 1960s at the main *entrances,* were replaced with wooden doors similar in design and color to the original doors to the building." GSA Fact Sheet 1 (emphasis added). The use of the plural "entrances" lent support to Ms. Fawcett's allegation that both the Fore and Commercial Street entrances were renovated in 1998. However, jurisdictional discovery has shown that this representation on the GSA website was not accurate and that the entrance doors were in fact renovated in 2009. Rogowicz Decl. ¶ 8. While precedent exists for taking judicial notice of information on official government websites, *see, e.g., Gent v. CUNA Mut. Ins. Soc'y*, 611 F.3d 79, 84 n.5 (1st Cir. 2010), this example suggests courts should revisit that practice or at least proceed with caution when considering doing so.

Accordingly, the question is whether the ABAAS in effect in 2009 required the GSA to take any particular action.[8]

As to scope, the ABAAS apply to "[a]ll areas of newly designed and newly constructed buildings and facilities and altered portions of existing buildings and facilities[.]" 36 C.F.R. pt. 1191, App. A (July 23, 2004 ed.) § 201.1. For alterations, "[w]here existing elements or spaces are altered, each altered element or space shall comply with the applicable requirements of Chapter 2 [of the ABAAS]." *Id.* § 202.3. An "element" is "[a]n architectural or mechanical component of a building, facility, space, or site." 36 C.F.R. pt. 1191, App. B (July 23, 2004 ed.) § 106.5. And a "space" is "a definable area, such as a room, toilet room, hall, assembly area, entrance, storage room, alcove, courtyard, or lobby." *Id.* A door is thus an "element," and because only the door to the Commercial Street entrance was altered, only the door (but not the entire entrance) had to comply with ABAAS. Accordingly, ABAAS did not specifically require the Government to add handrails or other accessibility features to the Commercial Street entrance just because it altered the door. And so, this choice not to add accessibility features was discretionary. *See Reyes-Colón*, 974 F.3d at 60.[9]

---

[8]    The Architectural Barriers Act Accessibility Standards ("**ABAAS**") were promulgated in 2004 and remained unchanged until 2013. Architectural Barriers Act (ABA) Accessibility Guidelines, 69 Fed. Reg. 44151 (July 23, 2004); Architectural Barriers Act (ABA) Accessibility Guidelines, 78 Fed. Reg. 59493 (Sept. 26, 2013). Here, I consult the 2004 ABAAS because they were in effect during the 2009 renovations.

[9]    Ms. Fawcett also argues that the 2009 Custom House renovations were extensive enough that the ABAAS required the GSA to add at least one "code-compliant and accessible entrance . . . connected to all primary function areas of the building" during that renovation. Pl.'s Suppl. Br. 7, 10–11. I do not need to reach that argument because the undisputed evidence now shows that the Custom House had such an entrance by the time Ms. Fawcett visited in 2023. *See* Rogowicz Decl. ¶¶ 9–10.

### b.    The Public Buildings Amendments Act[10]

Next, Ms. Fawcett cites the Public Buildings Amendments Act, 40 U.S.C. § 3312, and the related P100 Facilities Standards, as binding the GSA to act in a particular way with respect to accessibility at the Custom House. Pl.'s Resp. 7; *see* Def.'s Mot. Ex. 12 (ECF No. 12-12). Under that statute:

> Each building constructed or altered by the [GSA] or any other federal agency shall be constructed or altered, to the maximum extent feasible as determined by the Administrator or the head of the federal agency, in compliance with one of the nationally recognized model building codes and with other applicable nationally recognized codes, including electrical codes, fire and life safety codes, and plumbing codes, as the Administrator decides is appropriate. In carrying out this subsection, the Administrator or the head of the federal agency shall use the latest edition of the nationally recognized codes.

40 U.S.C. § 3312(b). However, Ms. Fawcett has not directed me to any nationally recognized codes that required specific conduct by the GSA with respect to Custom House renovations or accessibility. The statutory text quoted above is not itself a mandate for the installation of a handrail, for example.

Moreover, even if Ms. Fawcett had pointed to a particular code, I agree with the United States that Section 3312(b) leaves ample room for discretionary decision-making. *See* Def.'s Mot. 20–21. For example, it does not require compliance with any particular code, it implies that the agency head has discretion over which code to follow if multiple codes conflict, and it uses discretionary language like "to the maximum extent feasible as determined by the Administrator" and "as the

---

[10]    Ms. Fawcett does not address the Public Buildings Amendments Act in her supplemental briefing, perhaps because she no longer views that statute as a directing the GSA to take a particular action in this case. However, because she raised it in her opposition to the Government's motion to dismiss, I address it here.

Administrator decides is appropriate." 40 U.S.C. § 3312(b); *see also Alberty v. United States*, 54 F.4th 571, 576 (8th Cir. 2002) ("Section 3312(b) is couched in discretion.").

In sum, because Section 3312(b) of the Public Buildings Amendments Act does not "specifically tell[ ] federal officials to act a particular way," *Reyes-Colón*, 974 F.3d at 60, it does not remove the conduct here from the type of discretionary decision-making covered by the exception.

### 2. Was the Exercise of Discretion Actually or Potentially Influenced by Policy Considerations?

Because I find that the GSA's decision not to add accessibility features to the Commercial Street entrance in 2009 was discretionary, I next evaluate whether the agency's exercise of that discretion was "actually or potentially affected by legitimate policy-related judgments." *Reyes-Colón*, 974 F.3d at 59 (citations and quotations omitted). Because "the law presumes that government employees' discretionary decisions do indeed involve policy judgments," it is Ms. Fawcett's burden to allege "facts that would support a finding that [the GSA's] exercise of discretion in this instance was not susceptible to policy analysis." *Davallou v. United States*, 998 F.3d 502, 505 (1st Cir. 2021).

I have little difficulty finding that this discretionary decision could have been affected by policy analysis. The GSA's evaluation of whether to modify the Commercial Street entrance could involve consideration of cost, aesthetics, safety, and historical integrity, just to name a few. *See Fothergill*, 566 F.3d at 253 (listing "efficiency, safety, aesthetics, and cost" as factors "readily susceptible to policy analysis").

11

Accordingly, because this exercise of discretion was actually or potentially influenced by policy considerations, the discretionary function exception applies. I therefore lack jurisdiction over Ms. Fawcett's claim based on the GSA's failure to make the Commercial Street entrance accessible to visitors.

**B.    The Government's Failure to Direct Visitors to the Custom House's Safer or Accessible Entrances**

Ms. Fawcett asserts that the Government directed her to use the Commercial Street entrance to attend her appointment, rather than the entrances on Fore or Custom House Street. Pl.'s Suppl. Br. 9, 12; *see also* Am. Compl. ¶ 52(f), (k), (l). According to Ms. Fawcett, this instruction to use the non-accessible back entrance amounted to negligence. Pl.'s Suppl. Br. 12.

**1.    Was the Conduct Discretionary?**

The first question is whether this direction, or the related failure to inform Ms. Fawcett that there was a safer way to get in and out of the building, amounted to discretionary conduct. Ms. Fawcett has not identified any statute, regulation, or policy concerning this conduct. Thus, I proceed as if the challenged conduct is discretionary. *See Reyes-Colón*, 974 F.3d at 60.

**2.    Was the Exercise of Discretion Actually or Potentially Influenced by Policy Considerations?**

The next question is whether the Government's exercise of discretion on how to direct SSA office visitors to enter and exit the Custom House was actually or potentially influenced by policy considerations. As already noted, it is Ms. Fawcett's burden to rebut the presumption that the Government's discretionary conduct involved policy judgments. *Davallou*, 998 F.3d at 505. Here, Ms. Fawcett alleges that

visitors to the SSA office are largely "elderly, disabled, or both." Am. Compl. ¶ 22. She further alleges that the Government required visitors to navigate granite steps without the aid of a handrail in rainy Maine weather to attend their SSA appointments. In addition, she alleges that the Commercial Street entrance was on a busy street with limited parking, such that her daughter could not help her enter or leave the building. Finally, she alleges that the Government directed her to this difficult-to-navigate entrance when there were two other options available: one with a handicap-accessible walkway and automatic door, and another with a handrail.

The previously discussed discretionary decision about whether to make the Commercial Street entrance accessible in the first place was clearly susceptible to policy considerations. But here, Ms. Fawcett has alleged sufficient facts that the Government's discretionary decision was not (actually or potentially) the product of policy considerations. The Custom House already had an accessible entrance. Informing SSA office visitors about that entrance would not involve weighing social, economic, or political considerations. The SSA had to direct visitors to some entrance, after all. I can think of no policy implicated by choosing to direct the SSA-visiting population to a hard-to-navigate entrance when better options were readily available.

As the First Circuit has observed, where "the unreasonableness of the activity would be clearly apparent ex ante to any reasonable observer," it cannot be viewed as the product of policy analysis. *Hajdusek v. United States*, 895 F.3d 146, 152 (1st Cir. 2018); *see, e.g.*, *Smith v. United States*, 752 F. Supp. 3d 242, 264 (D. Mass. 2024) ("The decisions to leave the helicopter directly on the obvious and actively used snowmobile

13

trail near dusk without suspending or shortening the training plan and/or taking any mitigating precautions to alert approaching snowmobilers were neither based on policy-driven analysis nor susceptible to policy analysis."); *Dumais v. United States*, No. 22-cv-112-PB, 2023 WL 5237904, at *9 (D.N.H. Aug. 15, 2023) (citation and quotations omitted) (negligently maintaining a trailer by over-torquing bolts is "not the sort of decision grounded in social, economic, and political policy that the discretionary function exception is meant to immunize").

Because the Government's decision to direct SSA visitors to the Commercial Street entrance was not susceptible to policy considerations, the discretionary function exception does not apply. Therefore, I have jurisdiction over Ms. Fawcett's claim that the Defendant negligently failed to direct her to a safe or accessible entrance.

## II. Notice of Claim Requirement

Finally, the United States asserts that Ms. Fawcett's claim against the SSA should be dismissed for lack of subject matter jurisdiction for the independent reason that she failed to put the SSA on proper notice of her claims, as required by 28 U.S.C. § 2675. Def.'s Mot. 24–26. Section 2675 requires plaintiffs seeking to sue the United States to first exhaust administrative remedies. 28 U.S.C. § 2675(a). A plaintiff satisfies this requirement by providing written notice that contains "(1) sufficient information for the agency to investigate the claims, and (2) the amount of damages sought." *Santiago-Ramirez v. Sec'y of Dep't of Defense*, 984 F.2d 16, 19 (1st Cir. 1993). The First Circuit has described this test as "eminently pragmatic." *Dynamic Image Techs., Inc. v. United States*, 221 F.3d 34, 40 (1st Cir. 2000). "[A]s long as the language

14

of an administrative claim serves due notice that the agency should investigate the possibility of particular (potentially tortious) conduct and includes a specification of the damages sought, it fulfills the notice-of-claim requirement." *Id.*

The United States faults Ms. Fawcett for including a theory of liability against the SSA in her amended complaint that did not appear in her notice of claim. Def.'s Mot. 26. While the United States accurately observes that Ms. Fawcett did not spell out each theory of liability she now pursues in her notice of claim, I do not read Section 2675 as demanding that level of specificity. Ms. Fawcett sent her notice of claim to the SSA (as well as the GSA), explained her fall, and accused both agencies of negligence in maintaining or renovating the Custom House entrance without including a handrail. *See* Def.'s Mot. Exs. 15, 16 (ECF Nos. 12-15, 12-16). That was enough information for each agency to investigate the possibility of tortious conduct. To bar her claim for not fleshing out every possible theory of liability against each agency would violate the First Circuit's instruction to apply the notice of claim requirement pragmatically, not "woodenly." *Dynamic Image Techs.*, 221 F.3d at 40. Ms. Fawcett properly exhausted her administrative remedies before filing suit in this Court.

## CONCLUSION

For the reasons stated above, the Defendant's motion to dismiss the Plaintiff's amended complaint (ECF No. 12) is **GRANTED IN PART** and **DENIED IN PART**. The Plaintiff's negligence claim may proceed, but only to the extent it is based on the

Defendant's failure to direct Ms. Fawcett to a safer or accessible entrance to the Custom House.


SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 19th day of August, 2025.